Filed 12/1/21  P. v. Elias CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>EDWARD JESUS ELIAS,<br><br>  Defendant and Appellant. | D078137<br><br>(Super. Ct. No. SCD228929) |

APPEAL from an order of the Superior Court of San Diego County, Joan P. Weber, Judge.  Reversed.

Linnéa M. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Annie F. Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

Elias contends the court improperly denied his petition for resentencing under Penal Code,[1] section 1170.95 because he met his prima facie burden of

---

1    Further statutory references are to the Penal Code.

demonstrating eligibility. He argues the court should have issued an order to show cause to hold an evidentiary hearing at which the prosecution must demonstrate beyond a reasonable doubt that he is ineligible for sentencing. As we explain, because we agree that factfinding is necessary to discern the petitioner's role in the crime and whether he was convicted on a now impermissible theory, we will reverse the court's denial of the petition at the stage of a prima facie review and remand the matter for an evidentiary hearing.

I

FACTUAL BACKGROUND

We take the following facts of the offenses as set forth in our prior opinion, *People v. Chavez, et al.* (2014) 228 Cal.App.4th 18, 22–27 (*Chavez*).

"A. *The Palms Bonfires*

"Early in the autumn of 1993, a large area of undeveloped land located near the intersection of Interstate 805 and Palm Avenue in southern San Diego County was known as "the Palms." The Palms was for the most part barren dirt and, on a fairly regular basis, it was the site of multiple simultaneous bonfires attended by various groups of young adults. Navy personnel and their friends who frequented a country western club located on a local Navy base, Anchors and Spurs, often met at the Palms after Anchors and Spurs closed for the night and socialized together around one or more of the bonfires.

"On the night of September 24, 1993, a number of people from Anchors and Spurs attended a party at the Palms where there were two Anchors and Spurs bonfires. Witnesses estimated that the number of attendees ranged from 20 to 50 people. At the party, people smoked cigarettes, drank beer, and mingled. It was very foggy.

"Two United States Navy sailors, 23-year-old Keith Combs (Combs) and 20-year-old Eugene "Cliff" Ellis (Ellis), were

2

present at the Anchors and Spurs bonfires. Both young men carried wallets, base passes and military identification. Combs smoked Marlborough cigarettes exclusively.

"That night, Ellis drove a brand-new white Toyota pickup truck, which he had recently purchased with financial help from his father. Ellis's truck had fewer than 1,000 miles on the odometer. Ellis and Combs arrived at the Palms with two other sailors at approximately 7:30 p.m. but went back to their base with their two companions around 11:00 p.m. Once back at the Navy base, Ellis and Combs decided to return to the Palms. When they returned to the party, Ellis parked his truck with the back bumper facing one of the Anchors and Spurs bonfires.

"B. *Aggressive and Uncomfortable Behavior*

"During the hour between 4:00 a.m. and 5:00 a.m., members of the Anchors and Spurs party had experiences ranging from uncomfortable to distressing at and near where Ellis parked his truck.

"1. *Behmke*

"About 4:00 a.m., Barbara Behmke drove an Anchors and Spurs partygoer to the Balboa Naval hospital. Behmke's acquaintance had been in a fight at one of the bonfires and was bleeding. Behmke stayed at the hospital for a short period but returned to the Palms to look for a friend and find a jacket she had left at one of the bonfires. When Behmke returned to the site of the bonfires, she encountered four young Hispanic males. Two of the young men approached her. Behmke was later able to identify Chavez as one of the two young men. Chavez made sexual gestures and remarks that made Behmke very uncomfortable. According to Behmke, in response to her uncomfortable encounter with Chavez and his companion, she got in her truck and immediately left the area.

3

"2. *Duvall*

"Justin Duvall was also an enlisted member of the Navy and at the Anchors and Spurs bonfires on the morning of September 25, 1993. Around 5:00 a.m., two teenagers approached Duvall. Duvall was later able to identify Chavez as one of the two teenagers who approached him. The pair asked Duvall for beer. One of the two teenagers had his hand behind his back in a manner that Duvall felt was very threatening. When Duvall declined to give them beer, Chavez and his companion responded[,] 'you fucking cowboys, we don't like your music.' After Chavez and his companion returned to their own bonfire, Duvall immediately left the Palms with his friends. According to Duvall, he left immediately after his encounter with Chavez and his companion because: 'I felt uncomfortable. I knew something wasn't right. That's when I decided we better leave.' (Internal fn. omitted.)

"3. *Forde*

"Stephen Forde was parked next to, and within four to five feet of, Ellis's truck at the Anchors and Spurs bonfire. On that evening, Forde was 18 years old and, like Combs and Ellis, an enlisted member of the Navy. Forde was concerned about and keeping an eye on a friend who was somewhat intoxicated. Forde noticed two teenage males, one of whom he was able to identify as Chavez, sitting in a vehicle about 15 feet outside the circle of cars at the Anchors and Spurs bonfire. Chavez and his companion caused Forde to be concerned. They were laughing, and something about their mannerisms made Forde feel that he needed to move away from the vehicle the teenagers were in and get to the other side of the bonfire. Forde thought Chavez and his companion were acting like 'smart asses.' When Chavez got out of the vehicle he was in and walked toward the rear of the vehicle, Forde moved to the opposite side of the bonfire. Forde left the Palms about 5:00 a.m.

4

"4. *Kowalow*

"At approximately 5:00 a.m., Kristeen Kowalow saw three young men drive up to the Anchors and Spurs bonfire in a light-colored pickup truck with a camper shell. They appeared to be Hispanic. Two of the young men got out of the vehicle, hung out at the back of their vehicle and began talking to Kowalow. When Kowalow was shown a photographic lineup, she testified that Chavez's photograph looked familiar. The two young men were dressed in baggy clothing, and their attitude made people in Kowalow's group nervous; because of how the two young men made them feel, Kowalow and her friends left the Palms bonfires around 5:00 a.m. When Kowalow left, the only people remaining at the bonfire were two sailors and the three young men in the light-colored pickup truck. The only vehicles left were the light-colored pickup truck and a newer white pickup truck. Kowalow later told investigators the pictures of Ellis and his truck looked familiar.

"5. *Macy*

"Mary Macy and three friends were also at the Anchors and Spurs bonfire where Ellis had parked his truck. Although defendants' trial took place almost 19 years after the murders, Macy had a distinct memory of Ellis's truck because: 'It was brand new, and I was admiring it, that that was the type of truck that I liked, that I would like to buy.'

"About 5:00 a.m., Macy suddenly realized just about everyone appeared to have left the bonfire party. She had a 'bad feeling.' Macy told her companions 'we need to get out of here. Something is going on.' Her companions got into Macy's vehicle. As Macy started to get into the driver's side of her car, a light-colored pickup truck with a camper shell pulled up next to her. Two young men were inside. One rolled a window down, and the two spoke to her in English but with what she believed were Hispanic accents. The two young men made Macy nervous, and she ignored them and

5

left with her friends. When Macy was leaving, she noticed that only Ellis's brand new truck was still at the Anchors and Spurs bonfire. She did not see Ellis or Combs.

"C. *Crime Scene and Investigation*

"Between 7:00 a.m. and 7:30 a.m., a woman and her daughter were searching the Palms area for their son and brother and discovered the bodies of Combs and Ellis. Ellis's new pickup truck was no longer in the area.

"1. *Examination of Remains*

"Ellis's and Combs's bodies were in the dirt about 16 feet apart at the site of an extinguished bonfire. Their bodies were pointed in the same direction, nearly parallel to each other and angled slightly toward each other at the heads.

"Ellis was found faceup. There were fresh abrasions and bruises on his face and right lower leg, including a scratch on his face below his eye. There was also an abrasion on the back of his head or upper part of his neck that was not caused by a bullet wound. Ellis's clothing was uncharacteristically disheveled, with his shirt untucked and his belt undone. A U.S.S. Constellation ball cap was found lying between Ellis's feet. It was crumbled and had dried vegetation on it, as if someone had stepped on it. Blood was found on the ground on the vegetation area near Ellis and on his shirt. He also had dried vegetation stuck to his face. Because of the positioning of the body and location of blood, investigators concluded that he was initially face-down after being shot and had been rolled over onto his back before his body was discovered. (Internal fn. omitted.)

"[¶] . . . [¶]

6

"Post mortem examination of the bodies revealed that each had suffered three fatal gunshot wounds, six shots in total, all fired by a single gun. Ellis had an entrance gunshot wound in his chest; he also had a gunshot wound at his forehead and one in his back. The shot to Ellis's chest was accomplished at a distance. The shot to his head was made at very close range, within approximately an inch. Ellis was alive at the time of each shot.

"Combs was shot at close range, at three or four inches, in the middle of his back close to his spine. This fractured the left side of his spine and rib and perforated the aorta and left lung. He was also shot in the top of his head and at his left temple. Two of the projectiles were recovered from his brain. Combs was also still alive when each shot was inflicted, but any one of the wounds would have caused his death within minutes.

"The coroner testified that Ellis and Combs died at some point between 1:20 and 5:20 a.m.

"2. *Crime Scene DNA*

"At the scene of the killings, on the ground between the bodies and clustered together within several square feet, investigators found various car care accessories that appeared to be from Ellis's truck, including a can of Armor All tire foam, a can of polishing compound, a scrub brush, a map, and a college brochure with Ellis's fingerprints on it. The items were collected by investigators as a single evidentiary item, item 6. A white shoe box was among the items from Ellis's truck identified in item 6, and it appeared the other items in item 6 had, at one point, been in the shoe box.

"Within the area where investigators found the items identified in item 6, and near the scrub brush, investigators also found a recently smoked cigarette butt. The butt was from a Marlborough cigarette, the brand Combs smoked. It was collected separately as evidence item 7. The item 7 cigarette butt was 11 feet from Ellis's foot and 17 feet eight

inches from Combs's foot. The cigarette butt had ash still attached. Despite many footprints in the area and next to the bodies, no dust, dirt, footprints or tire tracks were on the cigarette butt, leading investigators to conclude it had recently been dropped there. Subsequent DNA testing revealed Elias was a major contributor to DNA found on the item 7 cigarette butt. Additional, more sophisticated DNA testing revealed that the cigarette may have been smoked by as many as two other persons. (Internal fn. omitted.)

"A second Marlborough cigarette butt, identified as evidence item 8, was found two feet two inches north of Combs. It had Combs's DNA on it. Like the first cigarette butt with Elias's DNA on it, this second cigarette butt also appeared recently smoked, as it had ash and a bit of paper remaining yet no footprints, dirt or dust on it. This cigarette butt was also believed to have been recently left at the scene.

"Investigators also collected touch DNA samples from Ellis's pants pockets. Chavez was found to be a major DNA contributor to those samples. Investigators were unable to find either Combs's or Ellis's wallet or their military identification, which they would have needed to return to their Navy base.

"3.  Recovery of Ellis's Toyota Truck

"Four days after the murders of Combs and Ellis, Chavez was found driving Ellis's pickup truck in Tijuana, Mexico. Neither the locks nor the ignition had been forced, and the keys were found in the truck. Investigators recovered fingerprints from both Chavez and Elias on various surfaces of the interior and exterior of the truck. Chavez's fingerprints were found on the driver's side door, the driver's side mirror, the rearview mirror, the exterior passenger side cab and front fender, and the front hood. Elias's fingerprints were found on the passenger side door and window, the rearview mirror, the rear sliding window, and the front hood.  Elias's fingerprints were also found on

a juice bottle in the truck. A red cup was found in the truck as well, and testing showed that both Chavez and Elias were major DNA contributors to samples recovered from the cup. Chavez's DNA was also recovered from a bloody bandage in the truck."

## II

## PROCEDURAL BACKGROUND

Elias was charged with two counts of first degree felony murder (§§ 187, subd. (a), 189), with an allegation that he personally used a deadly and dangerous weapon (§ 12022, subd. (b)). He was also charged as to each count with a special circumstance of aiding and abetting the crime of robbery as an accomplice (§ 190.2, subd. (a)(17)), and as to both counts the special circumstance that he was, in this proceeding, convicted of more than one murder (§ 190.2, subd. (a)(3).)

Following the 2012 trial, the jury found Elias guilty of each count of murder in the first degree (§ 187, subd. (a)) and found he was armed with a firearm in the commission of the crimes (§ 12022, subd. (a)(1)). The jury also found true the special circumstance that the murders were committed while Elias was engaged in committing or attempting to commit robbery (§§ 211, 190.2, subd. (a)(17)). Further, it found true the special circumstance that Elias had, in the proceeding, been convicted of more than one offense of murder in the first degree.

The court sentenced Elias to consecutive life sentences without the possibility of parole, plus an additional consecutive year for the use of a dangerous and deadly weapon.

On direct appeal, *Chavez*, *supra*, 228 Cal.App.4th at pages 22, 34, we reversed the life sentences without the possibility of parole and remanded the matter to the trial court for resentencing in light of *Miller v. Alabama* (2012) 567 U.S. 460 and *People v. Gutierrez* (2014) 58 Cal.4th 1354, because Elias

9

was a juvenile at the time of the murder. In our prior opinion, we concluded that there was sufficient evidence supporting Elias's convictions, including the finding of multiple murder special circumstance. (*Chavez*, at p. 22.) We also clarified in the unpublished portion of our opinion that the natural and probable consequences doctrine was not a theory raised by the People at trial.

On remand, the trial court resentenced Elias to two consecutive indeterminate life sentences of 25 years to life, plus one year for count 1 of using a dangerous and deadly weapon, and it stayed the sentence for the second count of using a dangerous and deadly weapon. The court stayed the deadly weapon enhancement on count 2, leaving Elias with a total term of 50 years to life, plus one year.

On January 24, 2019, Elias filed a petition with the superior court for resentencing pursuant to section 1170.95. His petition alleged the prosecution had proceeded under a theory of felony murder or murder under the natural and probable consequences doctrine, and he was convicted of first or second degree murder pursuant to one of those theories. It further alleged he could not in 2019 have been convicted of first or second degree murder due to changes to sections 188 and 189. His petition did not identify the reason or reasons that he could not now be convicted of first degree murder or second degree murder as a result of changes to the law. His attached argument stated that the evidence offered at trial was insufficient to prove he was present at or participated in the commission of the crimes.

The court appointed counsel and set a briefing schedule. The People responded with a motion to deny the petition for failure to establish a prima facie case, arguing that because the jury made a true finding of special circumstances allegations, the petition should be denied. The People filed a supplemental initial response, challenging the constitutionality of section

10

1170.95 and arguing the record of conviction provided substantial evidence to find Elias ineligible for resentencing because the jury's true finding established beyond a reasonable doubt that he acted with the malice required under amended section 188 and because the court of appeal found substantial evidence support the multiple murder special finding.

In Elias's reply to the People's supplemental response, he argued that regardless of the jury's special circumstances findings, his petition established a dispute about whether he was a major participant in the robbery and acted with reckless indifference to human life in light of the Supreme Court decisions in *People v. Banks* (2015) 61 Cal.4th 688 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

The parties each submitted additional supplemental briefing regarding whether the jury's true findings of the felony-murder special circumstance precluded eligibility for resentencing.

On September 29, 2020, the trial court issued its order denying Elias's request for resentencing, concluding he had not made a prima facie showing that he was entitled to relief. The court applied the standard of review used in a writ of habeas corpus, as requested by Elias, and it found that the jury's multiple murder special circumstances finding made Elias ineligible for relief. It explained that CALCRIM No. 702 instructed the jury that in order to find the multiple murder special circumstance to be true, the jury had to conclude Elias acted with intent to kill. The jury instruction required the People to prove intent to kill beyond a reasonable doubt for a true finding of a multiple murder circumstance. Thus, because the jury found the multiple murder special circumstance true, it "necessarily found that even if [Elias] was not the actual killer, . . . he acted with the intent to kill."

Elias timely appealed.

11

III

DISCUSSION

A. Legal Principles

The question of whether the court properly reviewed the record of conviction to determine Elias was not eligible for relief is one of law, which we review de novo. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437) was enacted to " 'amend[ ] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 842.) The bill redefined malice in section 188 and narrowed the class of persons liable for felony murder under section 189. (Stats. 2018, ch. 1015, §§ 2, 3.) Now, in order to be convicted of felony murder, a defendant who was not the actual killer or a direct aider and abettor to the murder must have been a major participant in the underlying felony who acted with reckless indifference to human life. (§ 189, subd. (e)(3); *People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)

Senate Bill 1437 also established a procedure for defendants seeking resentencing. Section 1170.95, subdivision (c) provides: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be

12

extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

When a trial court reviews a petition for resentencing, the court first determines if the petitioner has shown a prima facie case for relief under the statute. If so, the court must issue an order to show cause (OSC) and hold an evidentiary hearing on the petition. (*People v. Lewis* (2021) 11 Cal.5th 952, 962, 971 (*Lewis*).) However, the court may deny the petition if the person is ineligible as a matter of law. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980–981.) While the court may review the record of conviction, including any prior appellate opinion, to determine if the petitioner's allegations are rebutted by the record, it may not engage in factfinding and weighing credibility at the prima facie stage of petition review. (*Lewis*, at pp. 971–972.)

When a petition is filed under section 1170.95 the petitioner must present a prima facie case for relief. (*Lewis, supra,* 11 Cal.5th at p. 971.) Alleging the conviction was based on grounds now made impermissible under Senate Bill 1437 will show a prima facie case for relief. Absent anything to change the showing, the court should issue an OSC and conduct an appropriate evidentiary hearing. (*Lewis,* at pp. 971–972.)

### B. *Robbery-Murder Special Circumstance*

Elias argues that he is not ineligible for resentencing based on the robbery-murder special-circumstances findings because there is insufficient evidence in the record of appeal to determine whether he acted as a major participant with a reckless indifference to human life based on the factors detailed by *Banks* and *Clark*.

13

In the unpublished portion of our opinion affirming the judgment, we explained that in order to find a special circumstance murder based on a murder committed in the course of robbery against an aider and abettor, the jury had to conclude that Elias either had intent to kill or that he acted with reckless indifference to human life while acting as a major participant in the crime. However, we did not evaluate the factors that were subsequently detailed in *Banks* or *Clark* to determine that Elias was a major participant who acted with reckless indifference in killing the victims, and the jury's verdicts and findings do not disclose additional information relevant to these factors. Accordingly, the limited record before us does not demonstrate as a matter of law that Elias is ineligible for resentencing.

We recognize that a panel of this court previously found in *People v. Gomez* (2020) 52 Cal.App.5th 1, 15 that by finding a robbery and kidnapping special circumstance allegation true, a jury necessarily found the defendant had participated in the crimes with the intent to kill or that the defendant had acted as a major participant in the crimes who acted with reckless indifference to the victim's life, and so it concluded the defendant was not eligible for relief under section 1170.95.

However, like other panels of our division, we now "find ourselves persuaded by the logic of those courts that have determined a pre-*Banks* and *Clark* felony-murder special-circumstance finding does not necessarily preclude resentencing under section 1170.95." (*People v. Arias* (2021) 66 Cal.App.5th 987, 1004, fn. 6.) We conclude that "the evolving meaning of the terms 'major participant' and 'reckless indifference to human life' [means] that [the] special circumstance findings cannot be a categorical bar to

sentencing relief.")[2] (*People v. Wilson* (2021) 69 Cal.App.5th 665, 670 (*Wilson*).) Thus, were the only basis for Elias's conviction the robbery-murder special-circumstance finding here, we would remand the matter for an evidentiary hearing to determine whether Elias is entitled to relief.

### C. *Multiple Murders Special Circumstance*

However, the superior court here did not base its decision on the robbery-murder special-circumstance findings. Instead, it concluded that because the multiple murder special circumstance finding required a determination that the defendant acted with intent to kill, that finding precluded eligibility.

At trial, the prosecution argued that Elias was guilty of first degree murder either because he aided and abetted the deliberate, premeditated murders or because he aided and abetted robberies that resulted in the victims' deaths. Our opinion affirming the judgment of conviction concluded there was substantial evidence to support the theory that Elias had aided and abetted the actual killer, and it detailed why the evidence supported a first degree murder conviction based on a theory of aiding and abetting.

We also recognized that the multiple murder special circumstance required a showing of intent to kill, and we explained there was sufficient evidence for a reasonable jury to find intent to kill beyond a reasonable doubt. While we discussed the jury's inference that Elias intended to kill the victims because the evidence indicated he waited for the victims to be alone,

---

[2] The issue of whether a felony-murder special-circumstance finding made before *Banks* and *Clark* precludes a defendant from making a prima facie showing of eligibility for relief is currently under review by the Supreme Court. (*People v. Strong* (Dec. 18, 2020, C092262) [nonpub. opn.], review granted March 10, 2021, S266606.)

and then he confronted them as a member of an armed group overpowering the victims, we did not draw any specific factual conclusions.

In order to find the multiple murder special circumstance true, the jury was instructed that it must conclude either that Elias was the actual killer or that Elias was guilty of first degree murder as an aider and abettor who acted with intent to kill. (CALCRIM No. 702.) However, the jury instruction only required a finding that Elias had intent to kill one of the victims. (*Ibid*.) And the verdict form was not specific to each victim and did not identify whether both counts of first degree murder were based on intent to kill. Thus, the jury could have concluded that Elias was guilty of first degree murder on a felony-murder basis because he was a major participant who acted with a reckless indifference as to one victim and that he intended to kill the other victim. These are not determinations that can be made without factfinding and weighing evidence. Such action must await the issuance of an OSC and a properly conducted evidentiary hearing. Accordingly, the order denying Elias's petition at the prima facie stage must be reversed.

DISPOSITION

The order denying the petition is reversed and the matter is remanded to the superior court with directions to issue an OSC and conduct an evidentiary hearing.  We express no opinion about the outcome of such hearing.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.